RENDERED: FEBRUARY 21, 2008
TO BE PUBLISHED

# Supreme Court of Kentucky

2005-SC-000729-DG
AND
2006-SC-000256-DG

DATE 3-19-08 Susan Graham, D.C.

GEORGE HENRY GRIPSHOVER

APPELLANT/
CROSS-APPELLEE

V.

ON REVIEW FROM COURT OF APPEALS
CASE NUMBERS 2004-CA-000578 AND 2004-CA-000599
BOONE CIRCUIT COURT NO. 02-CI-00044

DARLENE GRIPSHOVER

APPELLEE/
CROSS-APPELLANT

## OPINION OF THE COURT BY JUSTICE ABRAMSON

## AFFIRMING IN PART, REVERSING IN PART, AND REMANDING

By Decree entered January 28, 2004, the Boone Family Court dissolved the marriage of George and Darlene Gripshover, apportioned and divided the couple's property, awarded Darlene child support of $199.32 per week, and awarded Darlene maintenance of $600.00 per month for five years. Contending that the trial court had erroneously excluded several tracts of realty from the marital estate and that its child support and maintenance awards were inadequate, Darlene appealed to the Court of Appeals. That Court, in an opinion rendered August 19, 2005, agreed with Darlene that the parties' transfer of five parcels of realty to a limited partnership and their assignment of their partnership interests to an irrevocable trust had not extinguished, for property

division purposes, Darlene's equitable interest in the realty. The Court therefore vacated the pertinent provisions of the family court's Decree and remanded the matter for a reassessment of the marital estate and for reconsideration of the maintenance and child support awards in light of that reassessment and of income adjustments the Court deemed necessary. Both parties petitioned this Court for discretionary review. George challenges the Court of Appeals' ruling that the transferred real property remained susceptible to family court division. He also challenges the Court of Appeals' disturbance of the family court's child support and maintenance awards. Contending that the Court of Appeals did not go far enough, Darlene insists that the trust was invalidly formed and should be declared void. She also contends that both lower courts misapplied the apportionment precedents of Kentucky case law when they awarded George a substantial non-marital interest in certain proceeds of a real estate sale. We granted discretionary review primarily to consider the validity and effect of the partnership and trust into which the parties transferred a large portion of their estate. Agreeing with the family court that those entities were validly formed and being further convinced that the transfers to them cannot be deemed either a fraud upon or a dissipation of the marital estate, we reverse the Court of Appeals' Opinion to the extent that it held that Darlene retained an equitable interest in the real property. We agree with that Court, however, that Darlene's child support and maintenance awards must be reconsidered, and so affirm in part, the Court of Appeals' Opinion.

## RELEVANT FACTS

George and Darlene married in June 1988 when George was in his late twenties and Darlene in her mid-thirties. Darlene brought to the union two children from a prior marriage. The Gripshovers' marriage produced two additional children, George W.

2

(dob: 8/1/90) and Austin (dob: 1/15/95). Neither party had advanced beyond the tenth grade in school, and Darlene's work history was limited to a brief stint at a grocery store and to work as a house cleaner. During the marriage, Darlene was primarily a housewife, but when Austin, who had been ill, no longer required her full-time care, she resumed housecleaning, earning as much as $300.00 to $375.00 per week, but often much less.

Along with his brother Camillus (Charlie), George operated what had once been their parents' farm on about 200 acres outside of Union in Boone County. George and Charlie had acquired the family farm by inheritance from their parents and by gift and/or purchase from their seven siblings. The farming concern has been successful, affording George, the trial court found, a personal income of about $64,000.00 per year.

At the time of the marriage George also owned an undivided interest, along with Charlie and their sister Kathy, in a 283.43 acre parcel of unimproved land in the Richwood section of Boone County. The three siblings, along with another brother, Tim, and their father, acquired the Richwood property in November 1981. As will be detailed below, George and Charlie ultimately inherited, purchased, or received as gifts their father's and their siblings' interests. The family members did not improve the Richwood property, but through the years, owing to economic development in the region, the property substantially appreciated. A portion of the Richwood property was sold in 1989, another portion in 1995, and the final portion in January 2001. George and Charlie used proceeds from the 1995 sale to purchase a 93.2 acre farm on U.S. Highway 42 in Boone County. In exchange for the final portion of the Richwood property in 2001, the brothers received three parcels of Mason County realty, valued for the transaction at $895,000.00, and a promissory note in the amount of $1,021,925.00.

3

Following the January 2001 exchange, the brothers found themselves the owners of a farming operation, including livestock and equipment; five parcels of northern Kentucky realty totaling more than 600 acres; and a promissory note for more than a million dollars. Hoping to protect these assets and to provide for their children, the brothers sought tax and estate planning advice from Hugh Campbell, an attorney and certified public accountant. Mr. Campbell recommended that the brothers form two limited partnerships -- a real estate partnership along with their wives, which would hold and manage the five parcels of realty (the Gripshover Family Limited Partnership #1) and a second partnership to own and manage the farming business (the Gripshover Family Limited Partnership #2). To minimize taxes and for inheritance purposes, Mr. Campbell further recommended that the partners in the two partnerships assign their partnership interests to trusts, two trusts for each family, an irrevocable trust to receive the real estate partnership interests and a revocable trust for the farming partnership interests. George's children, George W. and Austin, were to be the beneficiaries of both of George's family trusts. Charlie was to serve as trustee for George's irrevocable family trust, and George was to serve in like capacity for Charlie's irrevocable family trust.

In May 2001, George and Charlie had Mr. Campbell prepare the documents to effectuate this plan. According to Darlene, George did not reveal the plan to her until the night before they were to meet with Mr. Campbell to execute the documents. She resented not having been consulted earlier and was upset during the meeting with Mr. Campbell when he explained the plan to her and to Charlie's wife. Nevertheless she indicated that she understood the thrust of the plan, and she signed deeds transferring her interests in all of the realty to the Gripshover Family Limited Partnership #1 (the

4

realty partnership), as well as documents assigning her partnership interests to the George Gripshover Family Trust (the irrevocable family trust).

The parties separated in December 2001, and Darlene petitioned for dissolution in January 2002. She moved *in limine* to have the irrevocable family trust declared invalid on the ground that George and Charlie retained control over the realty and so had not effected a valid gift to the trust. Following a hearing in January 2003, the family court denied the motion and ruled that notwithstanding the two partnerships' continued management of the realty and the use of at least some of it in the farming business, the warranty deeds transferring the parties' interests to the partnership and the assignments of the parties' partnership interests to the trust constituted the irrevocable transfer to the trust of a present interest—the partnership interests—for a valid trust purpose— transferring assets to the parties' children as securely and with as limited tax liability as possible. The court noted Darlene's testimony to the effect that Mr. Campbell took two or three hours to explain the plan to her and to Charlie's wife, that she was accorded an opportunity to read the plan documents and to ask questions, and that she was informed that if she wished she could consult her own attorney. The court concluded that Darlene had not been misled or coerced, but had freely joined the estate plan and the gift to the trust.

Following a final hearing in November 2003, the family court entered the Decree summarized above. In assessing the parties' property, the court considered the assets of the Gripshover Family Limited Partnership #2 (the farm business partnership) as assets of the marriage and pursuant to KRS 403.190 assigned some of them to George as his non-marital property and made an equitable division of the marital remainder. The court divided the marital property equally, ultimately awarding Darlene

5

$152,792.00. Included among the assets of the farm business partnership was the $1,021,925.00 promissory note from the final Richwood property sale. Applying the apportionment formula of Brandenburg v. Brandenburg, 617 S.W.2d 871 (Ky. App. 1981), the family court determined that $185,998.00 represented George and Darlene's marital share of the note and so included half of that amount ($92,999.00) in Darlene's property award. The court excluded from its property analysis the five tracts of real property transferred to the Gripshover Family Limited Partnership #1, tracts totaling more than 600 acres and worth, according to Darlene, more than $3,000,000.00.

The court also made child-support and maintenance determinations. In August 2001, George and Darlene had moved from the old family farm in Boone County to a house in Dover, Kentucky in Mason County on one of the newly acquired tracts of land. When they separated in December of that year, Darlene remained in Dover, and George moved back to the Boone County home. Darlene testified that prior to the move she had regular house cleaning jobs four or five days per week which afforded her a weekly income of from $300.00 to $375.00. After the move to the more rural Mason County she found only a couple of regular cleaning jobs and was earning far less. She admitted, however, that her search for additional work had not been extensive. The trial court imputed income to Darlene at her pre-move level of $360.00 per week ($1,558.80 per month). The court ruled that George's annual income was $64,256.25 or $5,354.69 per month. It arrived at that figure by averaging his last four federal income tax statements and adding to the average ($46,256.25) $18,000.00 per year to account for the fact that George charged most of his housing, transportation, and food expenses to the farming business. The award to Darlene of child support in the amount of $199.32 per week was based on those amounts. Noting Darlene's $152,792.00 property award,

6

the parties' modest standard of living, and the fourteen year duration of the marriage, the court ruled that an award of lifetime maintenance would not be appropriate, but instead awarded Darlene maintenance of $600.00 per month for five years.

Darlene challenges virtually every aspect of the trial court's Decree. The court erred, she maintains (1) by excluding from its property analysis the realty, which was only nominally removed from the marital estate; (2) by awarding George a non-marital share of the $1,021,925.00 promissory note; (3) by attributing too much income to Darlene; (4) by attributing too little income to George; and (5) by awarding rehabilitative as opposed to lifetime maintenance when there is no realistic chance that Darlene will ever be able to support herself. As noted, the Court of Appeals agreed that notwithstanding valid transfers to the limited partnership and the trust, Darlene retained an equitable interest in the realty which entitled her to a portion of it upon dissolution. The Court also held that the trial court imputed too much income to Darlene, too little to George, and erred by awarding rehabilitative maintenance where the record suggested very little chance of rehabilitation. The Court upheld, however, the trial court's apportionment of the promissory note. George now challenges each of the Court of Appeals' adverse rulings. Darlene challenges that Court's ruling with respect to the promissory note and its ruling upholding the validity of the irrevocable family trust.

## ANALYSIS

### I. The Realty was Validly Removed from the Marital Estate and was not Subject to Family Court Division.

We begin our discussion with KRS 403.190, the statute governing property division upon marriage dissolution. Under that statute

> a trial court utilizes a three-step process to divide the parties'
> property: (1) the trial court first characterizes each item of
> property as marital or nonmarital; (2) the trial court then

7

assigns each party's nonmarital property to that party; and (3) finally, the trial court equitably divides the marital property between the parties. An item of property will often consist of both nonmarital and marital components, and when this occurs, a trial court must determine the parties' separate nonmarital and marital shares or interests in the property on the basis of the evidence before the court. Neither title nor the form in which property is held determines the parties' interests in the property; rather, Kentucky courts have typically applied the "source of funds" rule to characterize property or to determine parties' nonmarital and marital interests in such property. The "source of funds rule" simply means that the character of the property, *i.e.*, whether it is marital, nonmarital, or both, is determined by the source of the funds used to acquire the property.

Sexton v. Sexton, 125 S.W.3d 258, 264-65 (Ky. 2004) (citing Travis v. Travis, Ky., 59

S.W.3d 904 (2001), internal quotation marks omitted). This is in accord with KRS

403.190(2), which provides that

> For the purposes of this chapter, "marital property" means all property acquired by either spouse subsequent to the marriage except:
> (a) Property acquired by gift, bequest, devise, or descent during the marriage and the income derived therefrom unless there are significant activities of either spouse which contributed to the increase in value of said property and the income earned therefrom;
> (b) Property acquired in exchange for property acquired before the marriage or in exchange for property acquired by gift, bequest, devise, or descent; . . .
> (d) Property excluded by valid agreement of the parties; and
> (e) The increase in value of property acquired before the marriage to the extent that such increase did not result from the efforts of the parties during marriage.

George contends that the five tracts of realty transferred to the Gripshover Family Limited Partnership #1 were excluded from the marital estate by valid agreement of the parties and thus that the Court of Appeals erred when it ruled that Darlene was entitled to a distributive share of them. As the Court of Appeals suggested, fraudulent or dissipative transfers of marital property may be avoided or otherwise counteracted so as

8

to vindicate a spouse's interest in support or in an equitable division of the marital estate. Barriger v. Barriger, 514 S.W.2d 114 (Ky. 1974); Harley v. Harley, 255 Ky. 370, 74 S.W.2d 195 (1934); May v. May, 33 Ky. L. Rptr. 193, 109 S.W. 352 (1908); Solomon v. Solomon, 857 A.2d 1109 (Md. 2004); Hofmann v. Hofmann, 446 N.E.2d 499 (Ill. 1983). *See* Lee R. Russ, "Divorce—Dissipation of Assets," 41 ALR 4th 416 (1985) and J. R. Kemper, "Inter Vivos Trust—Impairing Spouse's Right," 39 ALR 3rd 14 (1971). Generally, however, a finding of fraud or dissipation requires that the challenged transfer be made in contemplation of divorce with the intent to impair the other spouse's interest. *See* Russ and Kemper, supra. *See also,* Robinette v. Robinette, 736 S.W.2d 351 (Ky. App. 1987) (dissipation). Here, as the trial court found and as the Court of Appeals agreed, there was no evidence that either party was contemplating divorce in May 2001, at the time the estate plan was executed, nor was there any evidence that George sought to impair Darlene's marital rights. On the contrary, the trial court expressly found that Darlene had not been defrauded of her rights but had joined in the estate plan knowingly and voluntarily. As the Court of Appeals observed, substantial evidence supports that finding, and Darlene does not challenge it.

The Court of Appeals erred, therefore, by ruling that Darlene retained an equitable interest in the transferred realty. Darlene contends, however, that notwithstanding her participation in the estate plan, the plan should be set aside because George and Charlie have not surrendered control over the realty and so have not truly given it to the irrevocable trust. The lack of a *bona fide* gift, she maintains, renders the trust a sham. We note that Darlene did not join in her action the Gripshover Family Limited Partnership #1, the other partners in the partnership, the trustee of the George Gripshover Family Trust, or the beneficiaries of the trust, all of whom would be

necessary parties to an action seeking to avoid either the partnership or the trust. Contrary to Darlene's contention, it is clear that the parties' estate plan did not contemplate an immediate transfer of the realty to the trust. The realty was transferred to the partnership to be used by the partnership for partnership purposes, including cooperation with the Gripshover Family Limited Partnership #2, the farming operation. There was nothing objectionable or underhanded about the partnership's maintaining control of the realty for that purpose, as clearly it is in the trust beneficiaries', (*i.e.* the children's) interest that George and Charlie's farming business continue to thrive. The realty was not transferred to the trust, but rather the partners' interests in the partnership, their right to receive distributions of partnership profits and property. This was a valuable present interest because the partnership owned the realty, and partnership interests were irrevocably given to the trust, a valid gift for trust purposes. As attorney Campbell explained, the gift of partnership interests permitted, or at least was intended to permit, George and Darlene to maximize their tax-free giving to the trust over the years and further sought to insure that upon dissolution of the partnership George and Darlene's share of the partnership assets would pass automatically to the trust. We agree with the trial court and the Court of Appeals, therefore, that the estate plan validly established both the Gripshover Family Limited Partnership #1 and the George Gripshover Family Trust. The Court of Appeals erred in holding that the realty was subject to division as marital property.

## II. The Trial Court Correctly Determined That George Retained a Nonmarital Interest in the Promissory Note.

We also reject Darlene's contention that the trial court erred when it awarded George an approximately 32% nonmarital share of the $1,021,925.00 promissory note. The note, as explained <u>supra,</u> was acquired in January 2001 as part of the exchange for

10

the final portion of the Richwood property originally purchased in 1981 by George, Charlie, their brother Tim, their sister Kathy, and their father. The property was originally acquired for $347,201.75 with a down payment of $86,800.44. Following the father's death in December 1984, his one-fifth interest was distributed equally among all nine siblings. Tim sold his interest to George, Charlie, and Kathy in 1986. The other siblings quit-claimed their interests (one forty-fifths) to the threesome in 1987. At the time of the marriage, in June 1988, the outstanding mortgage on the Richwood property was $197,908.20 indicating a principal investment of $149,293.55 ($347,201.75 – $197,908.20). In August 1988 and February 1989 the threesome made additional principal payments totaling $14, 486.10. The trial court determined that $2,489.00 of that amount was a marital contribution from George and Darlene (one third of the $7,466.79 February 1989 payment). The marital share, at that point, therefore, was $2,489.00 / ($149,293.55 + 14,486.10) or about 1.5 percent. In April 1989 the three siblings sold 78.921 acres of the Richwood property for $205,000.00. They used the proceeds to retire the outstanding indebtedness. The marital share remained 1.5 percent.

In February 1994, Kathy sold her one-third interest in the remaining 204.5 acres to George and Charlie for $175,000.00. The brothers acquired a $236,000.00 equity loan to finance the purchase and used the additional amounts, apparently, for operating and/or living expenses. The trial court ruled that the purchase from Kathy involved marital funds and so deemed the 1/6th interest (about 16.67%) George acquired from her as marital. That purchase thus brought George and Darlene's marital portion to about 18% of the total. Half of that, or about 9% ($92,999.00), is the portion of the promissory note the trial court awarded to Darlene.

11

Darlene contends, however, that George's entire half of the promissory note should have been deemed marital. She argues that because the other siblings apparently quit-claimed their 1/45[th] interests to George, Charlie, and Kathy in 1987 for no consideration except relief from their share of the debt, the property should be regarded as having no equity at that point, and that all the equity, therefore, was acquired after the marriage and solely as a result, so Darlene maintains, of the $2,489.00 marital contribution of February 1989. We agree with the Court of Appeals that the trial court did not err when it rejected this argument. The siblings' transfer of their small interests without consideration certainly does not compel a finding that they regarded the property as having no equity, and even if they did that would not compel a finding that the property in fact had no equity. On the contrary, the fact that a very short time later, in April 1989, less than a third of the property sold for more than the outstanding indebtedness adequately establishes, as the trial court found, that the property steadily increased in value and that the increase was the result of economic factors alone. The trial court and the Court of Appeals correctly addressed George's interest in the promissory note.

## III. The Parties' Incomes Must Be Recalculated.

### A. George should not have been allowed an alternative depreciation deduction.

We turn next to the trial court's awards of child support and maintenance. We agree with the Court of Appeals that those awards must be revisited. Both awards require consideration of the parties' incomes, and we share the Court of Appeals' concern that the incomes were incorrectly determined. KRS 403.212, the Child Support Guidelines statute, defines "income" as "actual gross income of the parent if employed to full capacity or potential income if unemployed or underemployed." KRS

403.212(2)(a). Subsection (2)(c) of that statute provides that

> [f]or income from self-employment . . . or joint ownership of a partnership . . . "gross income" means gross receipts minus ordinary and necessary expenses required for self-employment or business operation. Straight-line depreciation, using Internal Revenue Service (IRS) guidelines, shall be the only allowable method of calculating depreciation expense in determining gross income.

26 U.S.C. § 179, a section of the United States Tax Code, permits business tax payers to take an expense deduction for certain capital items up to a fixed maximum per year. Otherwise the taxpayer would need to create a capital account for the items and gradually depreciate them. Accordingly, George has appropriately used section 179 expense deductions in calculating his income for federal income tax purposes. In determining George's income, the trial court relied on his federal adjusted gross income and ruled that the section 179 deductions were appropriate adjustments to gross receipts under KRS 403.212. We agree with the Court of Appeals that the trial court erred in this conclusion. On its face, section 179 provides an alternative to standard, straight line depreciation, which KRS 403.212(2)(c) expressly identifies as the "only allowable method of calculating depreciation expense." On remand, therefore, George's income should be recalculated in accordance with the statutory limitation on depreciation.

## B. The record does not support the imputation of income to Darlene.

The trial court also erred in determining Darlene's income. As noted above, the statute defines "income" as "potential income if [the parent is] unemployed or underemployed." Darlene testified that while living in Boone County during the months leading up to the 2001 separation, she had worked four or five days per week for regular house cleaning customers. She earned, she estimated, between $300.00 and

13

$375.00 per week. Her adjusted 2001 income for tax purposes, however, was only $8,565.00. At the time of the final hearing in November 2003, Darlene was earning less than $100.00 per week from two regular house cleaning jobs. She testified that since moving to Mason County in the summer of 2001 she had inquired about only two other cleaning positions, both of which offered substantially less than minimum wage. Her impression, she stated, was that few people in largely rural Mason County had any interest in hiring regular house cleaners and those who did were not prepared to pay them enough to make the work profitable. The trial court deemed Darlene underemployed and imputed income to her of $360.00 per week or more than $18,000.00 per year, nearly twice what Darlene had earned during any of the previous four years.

KRS 403.212(2)(d) provides that

> [i]f a parent is voluntarily unemployed or underemployed, child support shall be calculated based on a determination of potential income . . . Potential income shall be determined based upon employment potential and probable earnings level based on the obligor's or obligee's recent work history, occupational qualifications, and prevailing job opportunities and earnings levels in the community.

We agree with Darlene that the trial court's imputation of income did not take adequately into account prevailing job opportunities, which were apparently much less in Mason County than they had been in Boone County, or Darlene's very limited occupational qualifications. Darlene was over fifty years old; had not worked outside her home except as a part-time housecleaner for nearly twenty years; had been in special education classes for most of her schooling, which ended with the tenth grade; and had health problems. In these circumstances, the trial court abused its discretion by imputing to Darlene an income level well in excess of what she had achieved even

14

when much younger and in better health. On remand, therefore, the trial court must redetermine both parties' incomes and recalculate child support accordingly. George's income may not be based on section 179 expense deductions, and income should not be imputed to Darlene without due consideration of all of the statutory factors.

## IV. The Maintenance Award Must Be Reconsidered.

We also agree with the Court of Appeals that the parties' disparate post-divorce circumstances require reconsideration of the family court's maintenance award. Maintenance awards are governed by KRS 403.200, which provides in pertinent part that the court may grant a maintenance order

> only if it finds that the spouse seeking maintenance:
>
> (a) Lacks sufficient property, including marital property apportioned to h[er], to provide for h[er] reasonable needs; and
> (b) Is unable to support h[er]self through appropriate employment.

As this Court has noted, our statutory scheme envisions post-divorce rehabilitation:

> KRS 403.200 seeks to enable the unemployable spouse to acquire the skills necessary to support himself or herself in the current workforce so that he or she does not rely upon the maintenance of the working spouse indefinitely.

Powell v. Powell, 107 S.W.3d 222, 224 (Ky. 2003). Accordingly, in fixing the amount and duration of an award, the trial court is directed to consider all relevant factors including:

> (a) The financial resources of the party seeking maintenance, including marital property apportioned to h[er], and h[er] ability to meet h[er] needs independently, . . .;
> (b) The time necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment;
> (c) The standard of living established during the marriage;
> (d) the duration of the marriage;
> (e) The age, and the physical and emotional condition of the

15

spouse seeking maintenance; and
(f) The ability of the spouse from whom maintenance is sought to meet his needs while meeting those of the spouse seeking maintenance.

KRS 403.200(2). We have recognized, however, that the statutory goal of rehabilitation will not always be attainable:

> [I]n situations where the marriage was long term, the dependent spouse is near retirement age, the discrepancy in incomes is great, or the prospects for self-sufficiency appear dismal, our courts have declined to follow that policy [rehabilitation] and have instead awarded maintenance for a longer period or in greater amounts.

Powell, 107 S.W.3d at 224. We agree with the Court of Appeals that this may be such a case.

While we cannot and do not say that the trial court's original maintenance award amounted to an abuse of discretion, our ruling that the parties' incomes must be redetermined and our clarification of the fact that George's continued benefit from the partnership realty is a factor bearing on the maintenance determination change the landscape enough to require that the maintenance award be revisited. On remand, accordingly, the trial court must again determine a suitable amount and duration of maintenance.

## CONCLUSION

To conclude, the estate plan the parties adopted in May 2001 validly transferred the five tracts of realty from the marital estate to the Gripshover Family Limited Partnership #1, and validly transferred the parties' partnership interests to the George Gripshover Family Trust. The Court of Appeals erred, therefore, to the extent that it purported to subject the real estate to family court division. The Court did not err, however, in ruling that the realty continued to bear importantly on the parties' post-

16

divorce circumstances or in holding that those circumstances call for a reassessment of Darlene's maintenance and the child support awards. Accordingly, we reverse the August 19, 2005 Opinion of the Court of Appeals to the extent that it calls for a new property division, but affirm its remand to the trial court for a recalculation of the parties' incomes, a corresponding recalculation of child support, and for reassessment of Darlene's maintenance award.

All sitting, except Schroder, J., not sitting. All concur.

COUNSEL FOR APPELLANT/ CROSS-APPELLEE
GEORGE HENRY GRIPSHOVER:

David A. Koenig
Dallas, Neace & Koenig
223 Main Street
P.O. Box 6205
Florence, KY 41022-6205

COUNSEL FOR APPELLEE/CROSS-APPELLANT
DARLENE GRIPSHOVER:

D. Anthony Brinker
Wehrman & Wehrman
301 Pike Street
P.O. Box 1226
Covington, KY 41011