Larry James ENSOR, Appellant/Cross–Appellee

v.

Deborah Lynn ENSOR, Appellee/Cross–Appellant

and

Deborah Lynn Ensor, Appellant

Larry James Ensor, Appellee.

Nos. 2010–CA–001660–MR, 2010–CA–001699–MR, 2010–CA–002048–MR.

Court of Appeals of Kentucky.

July 26, 2013.

Discretionary Review Denied by Supreme Court June 11, 2014.

J. Bissell Roberts, B. Mark Mulloy, Louisville, KY, for Larry Ensor.

John K. Carter, LaGrange, KY, for Deborah Ensor.

Before MOORE, NICKELL and THOMPSON, Judges.

## OPINION

NICKELL, Judge:

These are combined appeals and a cross-appeal from a judgment of the Oldham Circuit Court concerning valuation and division of property, maintenance and the assessment of post-judgment interest from the dissolution of marriage of Larry James Ensor ("Larry") and Deborah Lynn Ensor ("Debbie"). Following a careful review of the detailed record, briefs and the law, we affirm in part, reverse in part, and remand for further proceedings.

Larry and Debbie were married on June 14, 1980. The marriage produced two sons who are now adults. Larry has a third adult son from a previous marriage. Larry worked in his family's automotive parts

remanufacturing business, Hesco Parts Corp., LLC, which enjoyed great success for many years. When gross receipts from that business began to decline based on the loss of a major contract with Ford Motor Company, Larry and his two brothers, who also worked in the family business, began to diversify their investments. These investments included several real estate holdings which produced significant rental incomes.

In an effort to minimize tax consequences and to aid in the transfer of assets to their children, Larry and his brothers each undertook complex estate planning on the advice of family attorneys and accountants. One of the main vehicles suggested for accomplishing these tasks was the use of a Grantor Retained Annuity Trust ("GRAT"). Because the valuation and division of Larry's GRAT is at the center of the majority of the allegations of error in this appeal, an in-depth explanation regarding it is warranted. Although a somewhat complex concept to describe, in basic terms a GRAT is an estate planning tool wherein assets are transferred to a trust and ultimately to other beneficiaries so as to avoid estate taxes upon a donor's death. The use of GRATs for such a purpose is approved by the Internal Revenue Service.

To further effectuate their estate planning, Larry and his brothers formed a limited partnership known as LDF in December of 1997. On May 26, 1998, Larry and Debbie, along with Larry's brothers and their wives, executed four general warranty deeds conveying properties owned by FDL[1] collectively valued at $8,199,330.00 to LDF. Each of the wives executed the deeds for the specific purpose of transferring any dower interest they had, or might have had, in and to the

subject properties. The transfer of these properties was intended to facilitate the establishment of the brothers' GRATs. Larry created his irrevocable GRAT on June 30, 1998, and transferred his 33.2222% limited partnership interest in LDF to the GRAT while retaining his .0011% general partnership interest. His brothers completed similar transactions.

In return for transferring his limited partnership interest to his GRAT, Larry was to receive quarterly payments of $72,295.00 for a period of nine years with the final payment to be received in April of 2007. The total value of these payments was $2,602,620.00 and the deposits were reported on Larry and Debbie's state and federal income tax returns. The funds were deposited into the parties' joint checking account controlled by Debbie and were used for her personal purposes and to pay their joint expenses. Pursuant to IRS guidelines and regulations, following the formation of—and the transfer of assets to—the GRAT, a gift tax return was prepared and executed showing a taxable gift to Larry's sons totaling $58,377.00, based on their status as beneficiaries of the trust portion of the GRAT. This amount was arrived at using appropriate calculations and guidance from IRS publications.

Following the final annuity payment in 2007, Larry's direct beneficial interest in the GRAT was to terminate, and the GRAT would pay sums to Debbie for her needs and also for the health, education, maintenance and support of Larry's three children. Debbie was entitled to appoint a "qualified" successor trustee of her choosing and could designate beneficiaries from any or all of Larry's descendants to re-

---

1. FDL was a Kentucky limited partnership owned and operated by Larry and his brothers.

ceive the trust corpus at her death. In the event Debbie did not exercise her power of appointment, the GRAT would terminate at her death and be distributed in equal shares to Larry's three sons. Although divorce was not contemplated at the time the GRAT was created, under its explicit terms, Debbie's interest in the trust would terminate if she were to remarry following a divorce or Larry's death. If the GRAT ran its course as drafted, the net effect would be annuity payments to Larry and Debbie in excess of $2.5 million and the transfer of over $2 million in assets to Larry's children. The transfer of assets to the children in this manner had the added benefit of avoiding the nearly fifty percent estate tax which would be imposed if those assets remained in Larry's estate at his death and were then transferred to his children, a potential savings of over $1 million in taxes.

Unfortunate difficulties resulted in Larry and Debbie separating in November of 2003, and divorce proceedings being initiated in July 2004. A limited decree of dissolution was entered in January 2005 which reserved rulings on the division of marital assets. The parties stipulated to an "agreed valuation date" of December 31, 2004, for purposes of property division based on the complexity of their financial situation and the knowledge that many of their assets could fluctuate in value due to economic circumstances beyond the control of either of them. This was especially true of the real estate, business and investment holdings which comprised the bulk of the marital estate.

As the case developed over the course of the following three years, Debbie claimed she did not fully understand the extent of the assets transferred to the GRAT. She asserted she had been "kept in the dark" regarding the parties' financial dealings, and Larry had told her only that he was "going to put some money up for the boys." She indicated she knew nothing about a trust and would certainly never have agreed to release her share of an asset valued at nearly three million dollars had she known that was the intent of the documents Larry directed her to sign. In a motion to amend her pleadings—which was ultimately granted—Debbie alleged Larry had defrauded her into signing the deeds and other documents surrounding the formation of the GRAT. She sought her share of the "marital" interest in the corpus of the GRAT. By agreement of the parties, Debbie was awarded fifty percent of the remaining quarterly annuity payments due from the GRAT,[2] and these monies were considered an "advance" to be credited against the ultimate property division.

The trial court held a trial on the contested issues over the course of five days in April and May of 2006. A protracted period of additional discovery and contentious motion practice followed. On September 25, 2007, the trial court circulated a "rough draft" of its opinion to the parties for their review and requested each to tender calculations from their respective CPA's regarding the proper equalization of the marital estate. The parties complied and the trial court considered these expert reports in preparing its final opinion.

Findings of fact, conclusions of law and judgment as to the division of property and maintenance were entered by the trial

---

**2.** Following the date of entry of the divorce decree, the GRAT owed Larry approximately ten additional quarterly payments of $72,295.00 each, for a total amount due of $722,950.00. Thus, Debbie was awarded in excess of $360,000.00 from the annuity payments. No challenge has been raised to this award or its effect on the final property division.

court on May 28, 2008. Therein, the trial court evaluated and divided much of the parties' marital estate.[3] It devoted nearly eleven of the thirty-two pages to an in-depth discussion of the GRAT, including a discussion of its formation and purpose before finding it was valid and legally created. The trial court ultimately found Debbie was entitled to an equalization payment for her one-half interest in the marital portion of the GRAT. Based on this finding, the trial court convened sessions on four additional days in December 2008 and March 2009 for the purpose of obtaining a proper value for the GRAT assets. Another extended period of discovery and motion practice ensued. Throughout the course of the litigation, the GRAT—a separate legal entity—was never made a party to the divorce action, nor were the trustee or any beneficiaries or contingent beneficiaries of the trust.[4]

On February 18, 2010, the trial court entered its findings of fact, conclusions of law and judgment regarding the GRAT. It found the value of Debbie's share of the GRAT assets to be $1,392,108.00, plus an additional amount of $377,610.00 representing her portion of GRAT receivables in the form of outstanding loans and cash payments. Thus, in addition to the property and cash payments awarded to her by the order entered on May 28, 2008, the trial court ruled Debbie was entitled to a further equalization payment of $1,769,718.00. The judgment was designated as final and appealable, as was the

May 2008 order. Each party moved to alter, amend or vacate both judgments.

Following additional motions and hearings, the trial court entered amended findings of fact, conclusions of law and judgment on August 11, 2010, addressing all contested matters regarding property division and maintenance. Among numerous other amendments, the value of Debbie's share of the GRAT assets and receivables was reduced to $1,410,106.00, and the total equalization payment due from Larry to Debbie was reduced to $1,524,627.00.[5] This appeal and cross-appeal were timely taken from that order. Debbie has also appealed from the trial court's October 12, 2010, order granting her judgment interest at five percent on the cash equalization payment of $1,524,627.00 ordered to be paid to her in the August 11, 2010, judgment, rather than the twelve percent post-judgment interest she had requested. We have consolidated the three matters for the sake of judicial economy and will address all in this single opinion.

### *2010–CA–1660–MR and 2010–CA–1699–MR*

We begin with the appeal and cross-appeal emanating from the trial court's August 11, 2010, judgment. Larry raises ten allegations of error on direct appeal and Debbie raises seven additional allegations of error on cross-appeal. The majority of these claims are centered on the GRAT—including its valuation and division and the propriety of including it as part of

---

**3.** Although significantly more assets were divided between the parties, the major items at issue in this appeal are the GRAT and a home valued at $2,050,000.00 located in Gulf Shores, Alabama, which was awarded to Debbie.

**4.** The trial court rejected Larry's requests to join the GRAT and its beneficiaries as necessary and indispensible parties to the action.

**5.** This figure represented the amount that would equalize the disparity in the division of the marital estate as calculated by the trial court and was intended to equitably divide the assets between the parties.

the marital estate. Thus, our opinion will focus mainly upon the trial court's decisions regarding the GRAT, rather than upon the other, peripheral and comparatively minor areas of contention. We have, however, carefully considered all of the arguments made by the parties before the trial court and in their briefs before this Court, and will comment as needed on those issues.

### GRAT

At the core of the first and most hotly contested issue to be addressed in this appeal is the valuation and division of the GRAT. Over half of the allegations of error raised by the parties concern the trial court's decisions surrounding this single asset.

Larry contends the transfers to the GRAT were completed gifts made several years prior to the parties' separation and the trial court therefore erred in including the GRAT in the marital estate in the first instance. He further alleges the trial court erred in finding Debbie had a marital interest in the GRAT as there was no showing of fraud or dissipation of marital assets surrounding the GRAT or transfers thereto. He also raises issues regarding a lack of jurisdiction over the GRAT, what he believes are inflated and/or improper valuations of individual assets held by the GRAT, forfeiture, and public policy arguments.

Debbie alleges the trial court erred in discounting the value of the GRAT based on the GRAT owning only a minority interest in LDF and the lack of marketability of the assets held. She also challenges the trial court's finding that Larry did not perpetrate a fraud upon her in creating the GRAT and transferring marital assets into it.

We have carefully reviewed the voluminous record and the law and believe the trial court erred in including the GRAT in the marital estate and subject to division. Furthermore, as there was no finding or showing of a fraudulent or dissipative transfer, the trial court was without authority to find Debbie retained an equitable interest in the GRAT assets.

As a preliminary matter, we note Debbie failed to join the GRAT, its trustees, beneficiaries or contingent beneficiaries in this action, all of whom would clearly be necessary parties to any action seeking to avoid the trust. Larry urges us to reverse the trial court's decision to grant Debbie a marital interest in the GRAT based on this failure alone. We need not do so as we find there to be a more fundamental and dispositive error in the trial court's holding which we shall explore comprehensively.

In a dissolution action, the well-settled standard of review of a trial court's legal findings is *de novo*. *Hunter v. Hunter*, 127 S.W.3d 656, 659 (Ky.App.2003); *Carroll v. Meredith*, 59 S.W.3d 484, 489 (Ky. App.2001). It is also well-settled that an appellate court may set aside a lower court's factual findings

> only if those findings are clearly erroneous. And, the dispositive question that we must answer, therefore, is whether the trial court's findings of fact are clearly erroneous, i.e., whether or not those findings are supported by substantial evidence. "[S]ubstantial evidence" is "[e]vidence that a reasonable mind would accept as adequate to support a conclusion" and evidence that, when "taken alone or in the light of all the evidence, ... has sufficient probative value to induce conviction in the minds of reasonable men." Regardless of conflicting evidence, the weight of the evidence, or the fact that the reviewing court would have reached a contrary finding, "due regard shall be given to the opportunity of the trial court to

judge the credibility of the witnesses" because judging the credibility of witnesses and weighing evidence are tasks within the exclusive province of the trial court. Thus, "[m]ere doubt as to the correctness of [a] finding [will] not justify [its] reversal," and appellate courts should not disturb trial court findings that are supported by substantial evidence.

*Moore v. Asente,* 110 S.W.3d 336, 354 (Ky. 2003) (footnotes omitted). *See also* CR[6] 52.01, *Reichle v. Reichle,* 719 S.W.2d 442 (Ky.1986). We review the trial court's application of the law to those facts *de novo. Lindley v. Paducah Bank & Trust,* 114 S.W.3d 259, 263 (Ky.App.2002).

In dividing assets in a dissolution action, the initial inquiry must necessarily be whether a particular asset is part of the marital estate. Only after this question has been answered in the affirmative may a court determine under KRS[7] 403.190(1) that the asset is either marital or nonmarital for purposes of division. It is elementary that if an asset does not belong to either of the parties, there is nothing to divide and thus, the inquiry should end. Although generally this is not a great challenge to our trial courts, in the case *sub judice,* the complexity of the transactions involved in creating and funding the GRAT renders this determination infinitely more difficult. There exists very little published case law to guide trial courts in such multifaceted situations, and the court here clearly struggled and studiously considered all aspects of the issue before making its decision, as evidenced by its slow and methodical approach to resolving this case. Nevertheless, we are of the opinion that the creation and funding of the irrevocable estate planning trust removed the transferred assets from the marital estate.

Our analysis necessarily begins with KRS 403.190, the statute governing property division in dissolution actions, which states in pertinent part:

(1) In a proceeding for dissolution of the marriage or for legal separation, or in a proceeding for disposition of property following dissolution of the marriage by a court which lacked personal jurisdiction over the absent spouse or lacked jurisdiction to dispose of the property, the court shall assign each spouse's property to him. It also shall divide the marital property without regard to marital misconduct in just proportions considering all relevant factors including:

(a) Contribution of each spouse to acquisition of the marital property, including contribution of a spouse as homemaker;

(b) Value of the property set apart to each spouse;

(c) Duration of the marriage; and

(d) Economic circumstances of each spouse when the division of property is to become effective, including the desirability of awarding the family home or the right to live therein for reasonable periods to the spouse having custody of any children.

(2) For the purpose of this chapter, "marital property" means all property acquired by either spouse subsequent to the marriage except:

(a) Property acquired by gift, bequest, devise, or descent during the marriage and the income derived therefrom unless there are significant activities of either spouse which contributed to the increase in value of said property and the income earned therefrom;

---

**6.** Kentucky Rules of Civil Procedure.

**7.** Kentucky Revised Statutes.

(b) Property acquired in exchange for property acquired before the marriage or in exchange for property acquired by gift, bequest, devise, or descent;

(c) Property acquired by a spouse after a decree of legal separation;

(d) Property excluded by valid agreement of the parties; and

(e) The increase in value of property acquired before the marriage to the extent that such increase did not result from the efforts of the parties during marriage.

(3) All property acquired by either spouse after the marriage and before a decree of legal separation is presumed to be marital property, regardless of whether title is held individually or by the spouses in some form of co-ownership such as joint tenancy, tenancy in common, tenancy by the entirety, and community property. The presumption of marital property is overcome by a showing that the property was acquired by a method listed in subsection (2) of this section.

 Under that statute, trial courts are generally directed to use a three-step process in dividing the marital estate:

(1) the trial court first characterizes each item of property as marital or nonmarital; (2) the trial court then assigns each party's nonmarital property to that party; and (3) finally, the trial court equitably divides the marital property between the parties. An item of property will often consist of both nonmarital and marital components, and when this occurs, a trial court must determine the parties' separate nonmarital and marital shares or interests in the property on the basis of the evidence before the court. Neither title nor the form in which property is held determines the parties' interests in the property; rather, Kentucky courts have typically applied the "source of funds" rule to characterize property or to determine parties' nonmarital and marital interests in such property. The "source of funds rule" simply means that the character of the property, *i.e.*, whether it is marital, nonmarital, or both, is determined by the source of the funds used to acquire the property.

*Gripshover v. Gripshover,* 246 S.W.3d 460, 465 (Ky.2008) (citations omitted).

Larry contends the trial court erred in ruling Debbie was entitled to a marital share of the GRAT after erroneously including the GRAT in the marital estate. He alleges the irrevocable transfer of the four parcels of real estate to LDF removed them from the marital estate and the subsequent irrevocable transfer of Larry's partnership interest in LDF to the GRAT removed the partnership interest itself from the estate. Further, Larry contends that as the trial court expressly found there was no fraudulent intent in the formation and funding of the GRAT and it was created for a valid estate tax planning purpose, it was without authority to avoid or counteract the express purpose of the tax maneuver—to transfer valuable assets down a generational level with the lowest possible estate tax consequences and accompanying monetary burdens. He argues the trial court erroneously failed to find this matter on all fours with the factually similar holding in *Gripshover,* wherein a comparable estate plan was approved and the challenge by an ex-spouse was denied.

To the contrary, Debbie alleges the trial court's order did not grant her a "marital interest" in the GRAT, but rather required Larry to pay her one-half of the value of his interest in LDF, as the trial court had found the GRAT assets were beyond its reach and it was without jurisdiction to divide those assets. She believes that

since she did not acquiesce to formation of the GRAT or irrevocable transfers to it, the assets held in the GRAT remained marital property subject to division pursuant to the "source of funds rule" and the lack of a valid agreement between herself and Larry to remove the assets from the marital estate. Although she agrees with the trial court's ultimate holding, she believes the trial court erred in failing to find Larry perpetrated a fraud upon her in developing and implementing the estate plan which included the GRAT. Debbie also seeks to distinguish the holding in *Gripshover* on factual grounds.

■ In dissolution actions where issues arise concerning potentially nefarious property transfers, Kentucky courts have long-echoed the clear and unambiguous rule that

> fraudulent or dissipative transfers of marital property may be avoided or otherwise counteracted so as to vindicate a spouse's interest in support or in an equitable division of the marital estate. *Barriger v. Barriger,* 514 S.W.2d 114 (Ky.1974); *Harley v. Harley,* 255 Ky. 370, 74 S.W.2d 195 (1934); *May v. May,* 33 Ky. L. Rptr. 193, 109 S.W. 352 (1908); *Solomon v. Solomon,* 383 Md. 176, 857 A.2d 1109 (Md.2004); *Hofmann v. Hofmann,* 94 Ill.2d 205, 68 Ill.Dec. 593, 446 N.E.2d 499 (Ill.1983). *See* Lee R. Russ, "Divorce—Dissipation of Assets," 41 A.L.R.4th 416 (1985) and J.R. Kemper, "Inter Vivos Trust—Impairing Spouse's Right" 39 A.L.R.3rd 14 (1971). Generally, however, a finding of fraud or dissipation requires that the challenged transfer be made in contemplation of divorce with the intent to impair the other spouse's interest. *See* Russ and Kemper, *supra. See also, Robinette v. Robinette,* 736 S.W.2d 351 (Ky.App.1987) (dissipation).

*Gripshover,* 246 S.W.3d at 466. The trial court here expressly concluded Larry did not defraud Debbie, did not force or coerce her into signing any documents, and divorce was not contemplated when the transactions were completed in 1998. It further concluded the GRAT was legal and validly formed and in no way intended to invalidate the trust. The trial court reasoned, however, since Debbie was relatively unsophisticated in financial matters and was not advised by a professional as to the financial impact of the documents she was executing at the time she was doing so, the holding in *Gripshover* was distinguishable and thus, inapplicable. It then proceeded to conclude there had been a " 'non-disclosure of material facts' in connection with this estate planning procedure." Based on this conclusion, the trial court found Debbie was entitled to receive a cash equalization payment equal to one-half of the value of the GRAT assets. Larry disagrees with the trial court's ruling, and Debbie obviously contends it was correct. We agree with Larry and find *Gripshover* both compelling and controlling.

In *Gripshover,* the Kentucky Supreme Court laid down the applicable law relating to complex estate planning transfers such as the one in the case at bar. There, the husband and his brother owned five large parcels of real estate, a farming operation including livestock and equipment, and a promissory note for more than a million dollars. Upon advice of their attorney and accountant, the brothers formed two limited partnerships—one to hold and manage the real estate and the other to own and manage the farming operation. The brothers and their spouses executed deeds and other documents to effectuate the transfers. The partnership interests were then transferred to four separate trusts, with each brother having two trusts, for the purposes of securely transferring the assets to their children and minimizing

estate and gift taxes on the transfers. The real estate partnership interests were put into irrevocable trusts, while the farming operation trusts were revocable. The brothers' children were the beneficiaries of the trusts and each brother served as the other's trustee.

Approximately six months after the transfers, the Gripshovers separated and subsequently petitioned for dissolution of their marriage. The wife challenged the validity of the irrevocable trust and sought apportionment and division of its assets. The trial court denied the motion upon finding the estate plan was valid, the transfers were intended to effectuate trust purposes, the wife had not been defrauded or coerced into executing any documents, divorce was not contemplated when the plan was put in place, and no dissipation of the marital estate resulted from the transfers. A panel of this Court reversed the trial court. The Supreme Court undertook discretionary review and affirmed the trial court's ruling on this issue. Of particular import to our analysis, our Supreme Court held:

> it is clear that the parties' estate plan did not contemplate an immediate transfer of the realty to the trust. The realty was transferred to the partnership to be used by the partnership for partnership purposes, including cooperation with the Gripshover Family Limited Partnership # 2, the farming operation. There was nothing objectionable or underhanded about the partnership's maintaining control of the realty for that purpose, as clearly it is in the trust beneficiaries', (*i.e.* the children's) interest that George and Charlie's farming business continue to thrive. The realty was not transferred to the trust, but rather the partners' interests in the partnership, their right to receive distributions of partnership profits and property. This was a valuable present interest because the partnership owned the realty, and partnership interests were irrevocably given to the trust, a valid gift for trust purposes.

*Gripshover*, 246 S.W.3d at 466. The estate plan and purposes at issue in *Gripshover* were essentially identical to those devised for the Ensors. Debbie urges rejection of the application of *Gripshover* to this case and emphasizes that, unlike the spouse in that case, she was never consulted or counseled about the effects of the transfers to the GRAT. She also posits that one of the clear purposes of Larry's GRAT was to impair her marital rights in the property in the event of divorce—a fact not present in *Gripshover*. We are unpersuaded by her assertions.

■ Larry conducted his estate planning in excess of six years prior to the separation and ultimate divorce. Debbie joined Larry in voluntarily executing the warranty deeds which expressly conveyed her dower interest in and to the five parcels of commercial real estate to LDF. Larry's subsequent irrevocable gift of his interest in LDF to the GRAT, although sizeable, did not require Debbie's knowledge or consent, as a party is free to dispose of his marital assets as he sees fit so long as such disposition is not fraudulent or intended to impair the other spouse's interest such that it may properly be classified as a dissipation of the marital estate. *See Brosick v. Brosick*, 974 S.W.2d 498 (Ky.App.1998) (finding of dissipation requires showing the money was expended for non-marital purpose, was done in anticipation of divorce, and was done to deprive other party of his or her interest).

While giving away valuable assets may almost assuredly cause marital strife—and for that reason alone is generally avoided by those who wish to remain happily or peacefully married—we cannot conclude in

this instance that the transfer was inappropriate, especially in light of the substantial benefits which followed. Larry and Debbie equally reaped the financial benefits of this transaction by way of the quarterly annuity payments equaling in excess of $2,600,000.00. Debbie also retains a lifetime vested interest in the GRAT corpus that can provide for her needs if necessary. Debbie's contention that she did not receive an adequate benefit from the estate planning is disingenuous at best. Further, the original intention of the GRAT was to gift valuable property to Larry's three sons—two of whom are also Debbie's sons—with the least tax consequences legally possible.

As in *Gripshover*, there was nothing underhanded or objectionable about the intent of the estate plan, and the trial court here found the plan was legal, valid, and not undertaken with fraudulent intent or in contemplation of divorce or separation. We agree with that conclusion and Debbie's assertion that the trial court erred in failing to find fraud in the creation and funding of the GRAT is without merit.

Although Larry maintains continued management duties and responsibilities for the assets held by the GRAT, that is, his limited partnership interest in LDF which owns the commercial real estate transferred by the parties, execution of the warranty deeds transferring his and Debbie's interests to the partnership and the subsequent assignment of his partnership interest to the GRAT "constituted the irrevocable transfer to the trust of a present interest-the partnership interests—for a valid trust purpose—transferring assets to the parties' children as securely and with as limited tax liability as possible." *Gripshover*, 246 S.W.3d at 464. Thus, the real estate and partnership interests were validly removed from the marital estate and we must conclude the trial court erred

in determining the GRAT was "property" of the marriage subject to division upon dissolution.

Accordingly, the trial court's attempt to equitably divide the marital estate, which is in any way based on the value of the GRAT as a marital asset is tainted. Because we have determined the GRAT was improperly included in the marital estate, we must reverse that portion of the trial court's ruling holding to the contrary. We are compelled to remand the matter for further proceedings concerning the proper valuation and division of the parties' marital estate and effectuating a just and equitable division of same without reference to the GRAT or reliance on any of the assets held thereunder. Consequently, the trial court may also have to revisit other issues, such as the issue of maintenance discussed hereinafter.

Furthermore, our holding negates the need to address many of Larry's contentions regarding valuation of the GRAT assets, public policy violations, remaining annuity payments, jurisdictional questions, and inequitable division of the marital estate, as they are now moot. Likewise, Debbie's contention that the trial court erred in discounting the value of the GRAT based on the lack of marketability and extent of its holdings in LDF is rendered moot by our decision. However, Larry has raised a question as to Debbie's potential forfeiture of all future rights under the GRAT based on the forfeiture provision contained in the initiating documents, which deserves a brief observation. Although this argument was presented to the trial court, Larry admits the trial court failed to address it and he did not press the court for a ruling. Therefore, as the matter was not actually decided by the trial court, we have no authority to review it. *Regional Jail Authority v. Tackett*, 770 S.W.2d 225, 228 (Ky.1989). Our determi-

nation does not, however, prohibit Larry from arguing this point on remand nor does it hinder the trial court's ability to consider it, if properly raised. We make no comment as to the appropriate ruling to be made on the matter.

On remand, the trial court will also be tasked with determining whether the GRAT checking account held at National City Bank should be included in the marital estate. Larry contends this account should be treated the same as the real estate and partnership interests owned by the GRAT and be excluded from the marital estate. To the contrary, Debbie argues the funds held in the account stem from the annuity portion of the GRAT and should, therefore, be classified as marital property subject to division. We are unable to conclusively determine the source of the funds held in the account based on the record before us as such a determination was not in issue during the trial of this matter. Thus, additional factual findings by the trial court are necessary.

### Remaining Allegations of Error

■ Larry next contends the trial court erred in finding he failed to account for $164,673.00 of the $1,113,720.00 in distributions he received in 2004 from various businesses owned by the parties, and finding that sum was marital property subject to division. The amount "unaccounted for" arises from the refinancing of seven parcels of real estate for $779,673.00, of which sum $164,673.00 was received by Larry in 2004, with the remaining $615,000.00 being received in 2005. The trial court found the amounts received in 2005 were properly accounted for as accounts receivable on Larry's proposed valuation of the marital estate as of December 31, 2004. However, the trial court concluded Larry had failed to account for the sums he actually received in 2004 from the refinancing of

these properties. Larry believes the $164,673.00 was fully accounted for, stating the entire $779,673.00 was listed as partnership income on the parties' 2004 income tax returns although the $615,000.00 was not actually received until 2005, and contends the trial court erred in rejecting his argument. We disagree.

At the trial of this matter, a portion of the testimony received by the trial court from tax experts for each party specifically dealt with these distributions. The parties each vehemently argued their respective positions. The trial court ultimately chose to believe the testimony and arguments presented in Debbie's favor. Resolution of this matter concededly constituted a question of fact and required the trial court to weigh the evidence and testimony presented.

Questions as to the weight and credibility of a witness are purely within the province of the court acting as fact-finder and due regard shall be given to the court's opportunity to judge the witness's credibility. CR 52.01; *Sherfey v. Sherfey,* 74 S.W.3d 777 (Ky.App.2002) (*overruled on other grounds by Benet v. Commonwealth,* 253 S.W.3d 528 (Ky.2008)). Factual determinations made by a trial court will not be disturbed on appeal unless clearly erroneous, CR 52.01, that is, unless unsupported by substantial evidence. *Sherfey,* 74 S.W.3d 777. If testimony before the trial court is conflicting, as in this case, we may not substitute our decision for the judgment made by the trial court. *R.C.R. v. Commonwealth, Cabinet for Human Resources,* 988 S.W.2d 36 (Ky.App.1998). Based on our review of the record, we believe the trial court's decision was supported by substantial evidence and we cannot conclude it erred in its conclusion.

■ Next, Larry argues the trial court erroneously assigned him $60,000.00 in marital assets it found he had received

from the parties' joint checking account at National City Bank prior to the agreed valuation date. He contends his trial testimony, when coupled with a later affidavit, clearly shows these funds were used for marital purposes or to pay marital debts. The trial court clearly disbelieved Larry's testimony and specifically found the funds were used for attorney's fees and other expenses related to divorce proceedings or were otherwise utilized for personal expenditures. The trial court based its conclusion on other parts of Larry's own testimony. As stated previously, trial courts are given broad discretion to make factual findings and we discern no clear error regarding the trial court's findings on this matter. Thus, this ruling shall not be disturbed on appeal.

■ Larry next alleges the trial court erroneously valued a parcel of real estate located in Carroll County, Kentucky, at its original purchase price of $124,000.00. He contends the only competent evidence regarding the value of this property came from his real estate expert who placed the value at $98,500.00, and the trial court had no legitimate reason to reject his appraisal. The trial court clearly had before it more than Larry's appraisal upon which to base its decision, including evidence of the purchase price from two years prior to the valuation date and Larry's testimony that he had listed the property for sale for $129,900.00 some eight months prior to the agreed valuation date. The trial court exercised its broad discretion in judging the weight and credibility of the proffered testimony and obviously believed the relatively recent purchase price reflected a fair and just valuation of the property. We do not believe this factual finding by the trial

court was clearly erroneous and will therefore not disturb it on appeal.

■ On cross-appeal, Debbie contends the trial court erred in failing to conclude the parties' 2004 tax attributes [8] were a cash marital asset. Debbie argues the trial court's decision to divide these tax attributes equally between the parties does not equate to an equal division of the marital estate as she will not fully realize her share of the tax benefits based on her lack of income. She cites no legal authority supportive of her position. We are convinced none exists. Nevertheless, issues regarding the equitable division of marital assets are clearly within the discretion of the trial court, and will not be disturbed absent a showing of an abuse of that substantial discretion. *Sexton v. Sexton*, 125 S.W.3d 258, 272 (Ky.2004). Without citation to evidence of record or binding authority in support of her argument, we are unable to conclude the trial court's decision was "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky.1999).

■ Debbie next argues the trial court erred in failing to award her maintenance. The determination of entitlement to maintenance cannot be made until a proper division of marital property is completed. *See Newman v. Newman*, 597 S.W.2d 137, 138 (Ky.1980); KRS 403.200. Because we are reversing and remanding this case to the trial court for correction of the property division and equalization awards, we must also necessarily reverse and remand on the issue of maintenance. In doing so, we take no position and make no comment on the propriety or necessity of such an award, but leave that decision to the dis-

---

8. Debbie's tax expert valued these attributes at $621,310.00, while Larry's expert placed the value of the same attributes at $201,824.00. The values vary widely based on the questionable and speculative nature of the tax losses and the consistent expert testimony that the value was directly dependent on each party's income.

cretion of the trial court following its correction of the property division.

■ Debbie next takes issue with the trial court's awarding her the vacation home located in Gulf Shores, Alabama—valued as of December 31, 2004, in its unfinished state at $2,050,000.00—but making her solely responsible for all taxes, claims and costs associated therewith. The trial court had previously denied Larry's request that the home be sold and the proceeds be equitably divided. Debbie insisted on retaining the home for her own use contrary to the advice of her counsel and the trial court. She now contends the trial court erred in failing to hold Larry responsible for one-half of the taxes, claims and costs incurred prior to him transferring the property to her on September 3, 2010. Without citation to supporting authority, she alleges these debts were marital in nature as Larry's name was still associated with the home until his execution of the quitclaim deed and he should thus be responsible for an equal share of the debts. We disagree.

The trial court found Larry responsible for over $715,000.00 of the construction costs of the home which were unpaid at the time of the divorce and that Debbie was responsible for just over $100,000.00 of the same debt. Although Debbie maintained exclusive use and control of the property from its construction forward and Larry never saw or visited the property, the trial court also divided certain non-construction debts including homeowners' insurance premiums, flood insurance premiums, property taxes, and hurricane assessments levied by the Laguna Key Property Owners' Association. As stated earlier, the parties were divorced by a limited decree entered on January 18, 2005. The non-construction related costs Debbie seeks to have divided accrued after this date and were incurred solely for her benefit rather than for the benefit of the marriage as evidenced by her insistence on retaining this asset contrary to the learned advice and counsel of her attorney and the trial court. As such, these debts were of a non-marital character and we hold the trial court did not err in assigning Debbie all of the remaining ongoing, future debts, costs and expenses associated with the Gulf Shores property. *See Glidewell v. Glidewell*, 859 S.W.2d 675, 679 (Ky. App.1993).

■ Debbie's final argument on cross-appeal is that the trial court erred in concluding certain loans made during the marriage to LDF were not subject to division as marital property. Again, without citation to authority or support from the record, Debbie argues the trial court's decision constituted an abuse of discretion. We disagree. The loans in question were assigned to Larry as a marital asset[9] and Debbie was awarded one-half of the accrued interest payable to Larry on this loan. From what we can glean from her sparse argument, it appears Debbie is now arguing this same receivable should be subject to a second division. Doing so would be tantamount to allowing her to gain a double recovery of the value of this single asset. This would be improper and clearly contrary to the goal of an equitable division of marital property. Such actions will not be sanctioned or permitted by this Court. There was no error in the trial court's denial of this attempted manipulation of the parties' asset values.

9. By assigning this account receivable to Larry, Debbie became entitled to an offset to equalize the division of the marital estate. She contends the loans were valued at $402,666.00 while Larry contends the actual value as of the December 31, 2004, agreed valuation date was $366,167.00. The trial court accepted Larry's value.

### 2010–CA–002048–MR

Finally, we must dispose of Debbie's appeal from the trial court's October 12, 2010, order regarding the proper rate of post-judgment interest to be applied to the cash equalization payment. Debbie had sought an order awarding her interest at the statutory rate of twelve percent [10] on the $1,524,627.00 monetary award she received pursuant to the trial court's August 11, 2010, amended final judgment. Following a hearing on the issue at which only Larry presented testimony, the trial court awarded post-judgment interest at a rate of five percent, stating that throughout the litigation, it had utilized that rate of return on investments and reasoned it would be inequitable and unfair to impose a higher rate on the equalization payment. Debbie contends this decision was contrary to the law and constituted an abuse of discretion. We disagree.

KRS 360.040 states:

A judgment shall bear twelve percent (12%) interest compounded annually from its date. A judgment may be for the principal and accrued interest; but if rendered for accruing interest on a written obligation, it shall bear interest in accordance with the instrument reporting such accruals, whether higher or lower than twelve percent (12%). Provided, that when a claim for unliquidated damages is reduced to judgment, such judgment may bear less interest than twelve percent (12%) if the court rendering such judgment, after a hearing on that question, is satisfied that the rate of interest should be less than twelve percent (12%). All interested parties must have due notice of said hearing.

Debbie contends the plain language of the statute, coupled with the holding in *Cochran v. Cochran*, 746 S.W.2d 568, 570 (Ky. App.1988), makes clear that the interest rate on money awards in dissolution actions is twelve percent and is mandatory. Debbie correctly notes that Kentucky case law has consistently held trial courts are without authority to impose less than that statutory rate of interest in dissolution proceedings. *Id. See also Ridge v. Ridge*, 572 S.W.2d 859 (Ky.1978). However, the cases cited by Debbie refer only to money awards containing deferred payments for portions allocated to the non-paying spouse. Here, the amount awarded to Debbie was to be paid in a lump sum, and because of the large amount due, the trial court permitted a relatively brief period of time in which Larry was to obtain the funds and make full payment to Debbie.

Further, Kentucky courts have also held interest is not always required despite the mandatory language of KRS 360.040. Rather, the statute simply requires that a trial court must impose the statutory rate of interest once it determines that interest is appropriate. *Courtenay v. Wilhoit*, 655 S.W.2d 41, 42 (Ky. App.1983). Nonetheless, the trial court may find that the statutory interest rate is not appropriate given the equities of the particular case and may deny post-judgment interest altogether. *Id. See also Young v. Young*, 479 S.W.2d 20, 22 (Ky. 1972), and *Guthrie v. Guthrie*, 429 S.W.2d 32, 36 (Ky.1968).

We agree with the trial court that the equities of this case did not support an award of the statutory interest rate. The trial court conducted a hearing on the matter at which Debbie did not appear or provide any evidence. Larry's expert witness testified the appropriate rate should be one to two percent. Upon finding imposition of post-judgment interest at the statutory rate of twelve percent would be unfair and inequitable in light of the testi-

---

10. KRS 360.040.

mony and the court's prior orders applying a five percent interest rate on cash awards and distributions, the trial court exercised its discretion and set the rate consistent with its earlier rulings. Based on the record before us, and given the latitude granted to trial courts in exercising their equitable powers, we cannot conclude the trial court abused its discretion in reducing the post-judgment interest rate to five percent per annum.

For the foregoing reasons, the judgment of the Oldham Circuit Court appealed from in 2010–CA–001660–MR and 2010–CA– 001699–MR is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. The judgment appealed from in 2010–CA– 002048–MR is affirmed.

ALL CONCUR.