RENDERED:  JANUARY 12, 2024; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2022-CA-0806-MR

APRIL D. PERGREM                                                 APPELLANT


v.
APPEAL FROM MADISON FAMILY COURT
HONORABLE JEFF C. MOSS, SPECIAL JUDGE
ACTION NO. 14-CI-50198


CLARK D. PERGREM                                                 APPELLEE


OPINION
REVERSING

** ** ** ** **

BEFORE:  THOMPSON, CHIEF JUDGE; ECKERLE AND LAMBERT, JUDGES.

LAMBERT, JUDGE:  This is a post-dissolution appeal in which April D. Pergrem seeks review of the Madison Family Court's order terminating her maintenance award and the order ruling on her motion to alter, amend, or vacate that order and setting a new retroactive termination date.  We reverse.

April and Clark D. Pergrem were married in June 1996 in Madison County, Kentucky, and three children were born of the marriage.  April and Clark

separated on February 21, 2014, and Clark filed a petition to dissolve the marriage in the Madison Family Court on April 28th of that year. During the marriage, April was a homemaker and stayed home to raise the children while Clark's substantial income and assets provided the family with a luxury lifestyle. At the time the petition was filed, April estimated her expenses to be in excess of $24,000.00 per month. The parties also litigated the validity of a prenuptial agreement; the court found it was not unconscionable and, therefore, was valid and enforceable. The parties entered into a partial separation and property settlement agreement that was filed in December 2015. April was awarded the marital real estate in Richmond (including the residence and 19 acres of property), which had been appraised in 2012 to be worth $2.8M. April was to assume the indebtedness on the property and pay Clark $100,000.00. She was also awarded all of the personal property, household possessions, and furnishings in the residence, with the exception of Clark's personal items and clothes. Several issues, including maintenance, custody, and child support, remained to be decided.

The court held a hearing on January 19, 2016,[1] related to child support and maintenance. The court ruled on these issues by order entered February 19, 2016. In the order, the court stated that April owned non-marital interests in two rental property entities; she owned 99% of AKP, LLC, and 50% of W&A. She did

---

[1] The video recording of this hearing is not in the certified record.

not receive a paycheck or funds from these entities in 2015, and only a small amount of personal expenses was paid from them, if any. April's adjusted gross income in 2014 was $31,801.00. Since entering into the property settlement agreement, April had refinanced the marital residence in her name with her father's assistance; the monthly mortgage payment was $3,400.00, and she was receiving assistance from her father in paying the mortgage until she sold the home. April had been helping her parents with the family businesses and had not been looking for work. While she was not earning any income from this work at the time, she said she might draw a paycheck in the future. April continued to spend in excess of $19,000.00 per month, as was common during the marriage. The court went on to mention Clark's testimony regarding the losses he had incurred in the coal industry. To calculate child support, the court used annual gross incomes of $150,000.00 for Clark and $31,800.00 for April, and it ordered Clark to pay April $1,428.00 per month in child support.

Regarding maintenance, the court found as follows:

> As to permanent maintenance the Court makes a finding that [April] lacks sufficient property, including marital property apportioned to her, to provide for her reasonable needs in accordance with the standard of living the parties have known throughout their 19 year marriage. The Court further states that [April] is unable to support herself through appropriate employment to the standard of living she has become accustomed. Based on these findings the Court directs [Clark] to pay the amount of $4,500.00 per month to [April] effective March 1,

2016 as maintenance. This amount will be paid for five (5) years or until February 1, 2021 at which point the monthly maintenance shall be reduced to $3,000.00 per month beginning March 1, 2021. This payment shall continue until February 1, 2026 at which time maintenance shall cease. Maintenance shall also cease prior to the above described schedule in the event [April] remarries, or cohabitates with a non-relative male. In the event either party should die prior to the termination of maintenance as described by the schedule above the court may review maintenance payments upon request of either party or the estate of either party to determine if the maintenance should continue. All other payments [Clark] was previously required to make to [April] for the benefit of [April] and/or children shall terminate March 1, 20[2]6 with the exception of child support, maintenance, children's health insurance and Lexington School tuition for Ryder as described above.

Clark moved the court to alter, amend, or vacate the child support and maintenance order based upon evidence of gifts April had received from her parents (including the payment of the $3,400.00 per month mortgage and property tax payment) and upon his argument that she should be imputed income from the work she did, without pay, for the family businesses. Clark also argued that he was not financially able to pay the maintenance as ordered because his coal businesses were not doing well. He would have to liquidate his businesses and sell off his property in order to make the payments for maintenance, tuition, and health insurance. He used the $100,000.00 he received as his interest in the marital residence to meet his support obligations and to keep his businesses afloat. He had not received a paycheck in 2016.

-4-

The court held a hearing on March 30, 2016, to consider the pending motions, including Clark's motion to alter, amend, or vacate. The parties discussed April's income and work. While Clark argued that she was receiving gifts from her father, April pointed to her previous testimony that this was a loan that would have to be repaid. The court asked April questions about the mortgage payments. She said her father had made all of the payments (there had been three at that point). April testified that this was a loan that she would have to repay once she sold the house. There was documentary proof that this was a loan (such as "loan" being written on a check to the bank for the payment). Her father also paid the property taxes (around $15,000.00) at the time of the closing on the refinancing, which was also a loan. She continued to help out with the family businesses, including taking in the rent and making deposits. She did not receive any compensation for this. April stated that she did not receive any other type of compensation (utility bill payments, etc.) for the time she put into the family business. April had interests in two businesses, and she believed 25% of her work spent at the family businesses was related to her own businesses. April indicated that she still intended to sell the marital residence.

Clark's attorney stated that April's father had testified at the original hearing and in a deposition regarding other money he had given to her. Her father testified that the money he gave her was a loan but did not have any documents to

support this. He said that if she did not have the money to pay him, he would forgive it. For this reason, Clark argued that she should be imputed income for the time that she was working for no pay. The court discussed the issue and stated that when April sold the house, the loan issue could be looked into via a discovery request to see if she paid her father back at that point. If the loan had been forgiven, that might be a suitable ground for recalculation. There was also testimony from Clark that he purchased a $30,000.00 car for his son's 16th birthday with a bank loan (he told the bank the only things that had changed related to his finances were that he no longer had the house and was divorced) and at the same time signed his children up for Medicaid through Kynect, Kentucky's health insurance marketplace. The family court recognized and expressed its concern that Clark could not have provided the same financial information to obtain approval for both applications.

The court entered an amended child support and maintenance order on April 4, 2016. The court modified the amount of child support to $974.00 per month, and Clark was no longer credited with the payment of $579.00 per month for health insurance for the children. Accordingly, the court modified the maintenance schedule and ordered Clark to pay April $5,000.00 per month for five years beginning March 1, 2016, and then $3,500.00 per month for five years, until

February 1, 2026. The other conditions as to remarriage or cohabitation and the death of a party remained.

The court held a final hearing on July 27, 2016, on the remaining issues, and the court entered its findings of fact, conclusions of law, and decree dissolving the marriage on October 11, 2016. The court reaffirmed the amended maintenance order in the decree.[2]

Just over three years later, on January 27, 2020, Clark moved the family court to terminate maintenance. As grounds, Clark stated that he had proof that April had begun cohabitating with Clay Fuller, her boyfriend of four years, in August of 2018. He said April had been acting in bad faith to conceal their cohabitation to ensure that maintenance payments would continue. Clark went on to detail the evidence that he and a hired private detective had collected through photographs, social media, conversations, mail, and documents. He requested that maintenance be terminated as of the date she and Fuller began cohabitating. In her response, April denied that she was cohabitating with a non-relative male, although she stated that she was in a dating relationship with Fuller, who maintained his separate residence in Lexington and was responsible for his own and his child's

---

[2] Clark filed a notice of appeal from the October 11, 2016, decree (Appeal No. 2016-CA-1690-MR). April moved to dismiss the appeal due to Clark's failure to file a brief. This Court granted the motion based upon Clark's failure to prosecute the appeal in substantial compliance with the Kentucky Rules of Civil Procedure and dismissed the appeal on August 17, 2017.

expenses. April also stated that the court had not defined cohabitation in the order and that the court should look to the economic impact of any alleged cohabitation before reaching a decision. Clark had not presented proof of a new financial resource that would render continued maintenance unconscionable.

The court held a hearing on May 20, 2020, to determine what standard was to be applied. And by order entered June 17, 2020, it determined that Clark would have to make a showing at the hearing on his motion to terminate maintenance that April's alleged cohabitation impacted her finances; proof of cohabitation alone would not be sufficient. A contentious period of discovery followed, including litigation regarding Fuller's personal financial documents that resulted in a separate appeal in which Fuller was successful (Appeal No. 2021-CA-1009-MR). This Court concluded that until cohabitation had been established, Clark was not entitled to Fuller's personal financial documents. While Fuller's appeal was pending, the discovery disputes between Clark and April continued through motions to compel filed by Clark related to bank and credit card information.

On July 7, 2021, Clark filed a second motion to terminate maintenance on the basis that April now had the financial resources she had testified she lacked during the dissolution proceedings in 2016. She was being paid by the family companies, he believed a loan from her father had been

forgiven, and her bills and expenses were being paid from her two LLC business accounts. He also discussed the value of April's residence; she testified in 2016 that it was worth $1.8M but it was currently listed for sale for $3.9M. Clark maintained that April had minimized her income at the final hearing in 2016 to obtain a maintenance award and that, based upon her new financial resources, it was appropriate for the court to terminate the award.

The court held an evidentiary hearing on August 10, 2021, where the court heard testimony to determine whether Clark was entitled to credit card statements through discovery. April testified about her businesses and her credit card use. She stated that she used the W&A credit card for work purposes. April bought groceries for the employees in the Park Place office, set up catering, did the deposits, and bought all of the office and cleaning supplies. Some of the items she purchased might have been for herself; she would even it out later with other purchases using her personal funds. It was an informal tradeoff. She said it was not anyone's business how she ran her business. She used the card at Lowe's, Office Depot, Meijer, Kroger, Walmart, and gas stations. The court indicated that if there was a co-mingling, that would be information needed to determine whether Clark was entitled to the credit card records.

April then testified about a second American Express card owned by Ramsey & Ramsey LLC, a family company that she was not part of. She

explained that her father bought her brother/his son out of the business a month before he passed away. She then had to step in to help run the business. Ownership never changed hands, but the company went to the father's trust upon his death. Her mother was the trustee, and April was a beneficiary of the trust. April used the credit card for the first month after her father passed away, but it had been put into a safety deposit box six months later, where it had been for a year. April stated that she similarly used this credit card for personal use like the other one, in a minority fashion.

Clark questioned April about her testimony at the original trial that her father was not giving her money on a monthly basis. She did not remember that testimony because it was six years ago. Her father had testified that he had been giving her money every month. She said her father paid her because Clark had cut up the credit cards before they were even divorced; her father wanted to help her and the children. April testified here that the money her father gave her could have been a loan. Her father was providing money for the mortgage to the bank. April testified that she had not paid her father back and that this was a gift.

Clark's current wife, Tracey Pergrem, testified that she would collect April's trash every week or so early in the morning and that a detective she and Clark hired had installed a camera across from Fuller's house.

By order entered September 7, 2021, the family court ordered April to produce credit card statements for two American Express accounts (the first from June 1, 2018, to present, and the second from January 1, 2020, to present). April filed a letter from an attorney for Ramsey & Ramsey stating that the sole member of the LLC was the Estate of James William Ramsey and that April was not authorized to access the account information for one of the American Express accounts.

The court scheduled a hearing for January 25, 2022, on the motion to terminate maintenance. It later directed that this hearing would not address any issues related to Fuller or his impact on April's income and/or expenses because of his pending appeal.

At the January 25, 2022, hearing, the court heard testimony from April, Clark, and Tracey. April testified first on cross-examination. Her current monthly expenses totaled around $24,000.00. Her total monthly income was $13,027.00 (or around $11,500.00 post-tax). She received $3,500.00 in maintenance, $975.00 in child support, $5,000.00 from Ramsey & Ramsey, $726.00 in health insurance from Ramsey & Ramsey, and $2,826.00 from ARP, LLC. When asked about how she met the monthly shortfall of more than $12,000.00, April stated that her parents had helped her out and that it was not anyone's business if it was a gift or a loan. April then testified that the money she

-11-

had received from her father was a loan as set forth in a 2015 promissory note, which Clark produced. April also denied that she met the shortfall through pre-tax dollars from her businesses, after which Clark went through business accounts and credit card statements with her. April admitted that she had paid some personal expenses out of her business accounts, including property taxes, attorney fees, utility bills, house painting, landscaping, clothing, and personal trainer fees. She maintained that the credit card purchases for gas and groceries were for the businesses.

Clark testified next. He thought his net worth in 2016 was $36M, not $45M. He stated that he had been having problems paying maintenance for the last six years and that he had sold assets to maintain his business and pay maintenance. Clark's total annual income was between $100,000.00 and $110,000.00. He had not received a paycheck for the last three years. His expenses included the electric bill, food, clothing, child support, auto insurance, car loans, and payments to the IRS. His salary from Onyx was $75,000.00 per year. He stated that his money was not liquid, but in equipment, and that he had $5M or $6M in assets. He also had a subdivision from which he had sold a total of 18 lots. Clark said his income had not changed very much in the last six years and that he had to sell most of his assets. Clark agreed that since 2016, he had purchased a ring for his new wife, had a three-day destination wedding, paid support, drove a Maserati (he said he got a

-12-

good deal on it), traveled to Florida to visit his current wife's parents, and belonged to a country club. He and his wife, Tracey, had also been building a house on his farm property for three and a half years.

Clark stated that he had told the court six years ago he did not have the money to pay April, but the court instructed him to sell assets in order to make the maintenance payments, which he did. He would not have been able to pay maintenance without selling his assets. Clark believed that April should be able to meet her reasonable and necessary expenses with $20,500.00 per month and that he should not be required to pay maintenance. He resented having to pay maintenance for April and her boyfriend.

April testified on direct examination that her income in 2016 at the time of the dissolution was less than it was currently because she had not been working outside of the home but had been taking care of the children, which included several hours of transporting them to school and activities each day. Clark worked out of town four days a week and had made millions of dollars after selling his businesses. During the dissolution proceedings, April was working to an extent through her family's businesses but did not get a paycheck. Her father was helping because Clark had canceled the credit cards. Post-dissolution, her expenses had increased. Her property taxes went up, and she paid for the mortgage and maintenance of the property.

When asked how she met her shortfall in expenses, April stated that she paid for some things on the credit card. She needed to take care of their three children, and while the older two had jobs, she supplemented their income. She was currently receiving $3,500.00 per month in maintenance and had been since March 2021. She had to adjust her spending when the amount of maintenance she received decreased by $1,500.00. She said it would be tight to live without the maintenance payment.

April began being paid by Ramsey & Ramsey about two years after the divorce. Once the children got older and could transport themselves, she had more time to spend in the office. She had told the court during the dissolution proceedings in 2016 that she would begin working once the children were older. She earned $5,000.00 per month beginning in 2018.

When the decree was entered, April received no assets; she purchased the marital residence, which was 17,000 square feet and on 20 acres of land, by taking on the debt and paying Clark $100,000.00. The house was the only asset put in her name during the marriage. The house had appraised at $2.9M at the time of the divorce six years ago. She owed $970,000.00 when she took over the loan, meaning there was close to $2M in equity. April had been trying to sell the marital residence for several years; she wanted to sell the property because it was too expensive and big for her and the youngest child. She also wanted to move away

-14-

from where Clark and his wife currently lived. She had it listed on the market for $3.6M, but there had not been a formal offer to purchase it. As to the promissory note with her father, April said it had not been collected. She would pay the debt if necessary once she sold the house. April did not know exactly how much money her father had provided related to mortgage and other payments, but that could be calculated. She stated that she and her father had taken out a second loan on the house, taken over the debt, and paid Clark $100,000.00.

April testified that her monthly expenses had increased by about $6,000.00 while her income had only increased by $5,000.00 per month. She asked the court to continue the $3,500.00 in maintenance.

The court directed the parties to file post-trial memoranda. In April's memorandum, filed March 4, 2022, she stated that she was currently receiving the reduced amount of $3,500.00 per month, which would continue through February 2026. She indicated that there was no evidence of an overall decrease in Clark's income. She stated:

> Clark continues to own millions in assets which generate income for him and while April has begun to earn an income she remains to have only one asset, the marital residence, which generates no income for her, but rather has an increased post divorce debt as a result of refinancing the mortgage into her own name and payment to Clark of $100,000.00. The property continues to be listed for sale with no offers to purchase. . . . [The court's maintenance schedule] provided April with funds to assist with her living

expenses for a period of time determined by the court [to be] necessary to become self reliant and to compensate April for the lack of assets awarded to her.

April described her sources of income as well as Clark's post-divorce lifestyle. April asserted that "Clark remains a multi-millionaire capable of continuing his maintenance obligation of $3,500.00 for the next four years with same not being an unconscionable, unfair, or an inequitable obligation." April argued that, in lowering the amount of her maintenance award after five years, the family court had anticipated that she would obtain employment and that she should not be penalized for doing so. She still relied on maintenance to meet her monthly needs.

In his response, filed a few days later, Clark listed April's known financial resources at the time he filed his second motion to terminate maintenance as 1) a $60,000.00 per year job at the family business (where she had been working without pay in 2015 and 2016); 2) increased income from her two businesses; and 3) proof that April had been paying her personal expenses out of the businesses. Clark also discussed the promissory note between April and her father that he had found in her trash and whether it had been forgiven. The testimony established that April had income in the amount of $13,027.00 per month, along with help from her parents, and monthly expenses of approximately $24,000.00. Clark argued that $24,000.00 per month for expenses was not reasonable or necessary and that it was manifestly unjust to require him to continue paying her

-16-

maintenance. He also stated that April had hidden the facts and confused the issues. He believed his own financial circumstances were irrelevant. Clark requested that the court terminate maintenance with a retroactive date of January 24, 2020, the date he filed his first motion and put April on notice that he was contesting the continued payment of maintenance. Based on April's fraud, however, he suggested it would be proper to require her to repay the maintenance she had received from March 2016 through January 2020.

On May 3, 2022, the court entered an order granting Clark's motion to terminate maintenance. The court stated:

> At the initial hearing in this matter, and the later hearing regarding [Clark's] Motion to Alter, Amend or Vacate on March 30, 2016, [April] established that she was working for her family's businesses but was not being paid for her efforts. She also testified that her father was making her house payment at the rate of $3,400 per month and had paid her most recent property taxes of approximately $15,000. [April] testified that the amounts were not gifts from her father but were a loan that she would be forced to repay. On or about August 10, 2021, [April] testified that the funds she received from her father were in fact a gift from her father. [Clark] produced an original note between [April] and her father dated in 2015. This note was found in [April's] garbage.
>
> [April] testified that she currently has income of $5,000 per month from Ramsey and Ramsey and $2,826 per month from ARP, LLC. She also has her health insurance paid by Ramsey and Ramsey at the rate of $726 per month. After including child support at $975 per month and maintenance at $3,500 per month, [April]

-17-

has post-tax income of approximately $11,500. She also claims current expenses of just under $24,000 per month. In explaining how she covers the deficit, [April] explained that her family helps her financially. This too was different from her testimony at the initial hearing.

During the January 25, 2022 hearing, much time was given to the expenses paid for [April] through the family businesses. Proof was offered that property taxes, attorney fees, utilities, painting and landscaping, clothes, and a personal trainer were all paid for by [April] through the various family businesses to which she has access. It was difficult for the Court to assess what expenses were valid business expenses and what expenditures were for [April's] personal expenses and therefore a contribution to [April's] household. The Court has sympathy for [April's] accountant, but when the proof is combined with [April's] admission of help from her family to make ends meet, the Court is comfortable in asserting that [April] receives many financial benefits from the family businesses with which she is associated. These benefits are in addition to her salary.

[April] originally offered approximately $19,000 per month in expenses and now offers approximately $24,000 per month in expenses. While [April] initially offered that she had no income other than child support and maintenance, she now acknowledges she has personal income of at least $11,500 per month. What is most troubling to the Court is the source of [April's] income. All the sources of income that [April] has currently, other than child support and maintenance, are related to her family businesses. At the time of the original maintenance order, [April] was doing similar activities to what she is doing now for those businesses. The only difference is she is now being paid, whereas previously, she was "volunteering." [April's] testimony in response to [Clark's] Motion to Terminate Maintenance leads the Court to believe that her testimony earlier in this matter was either less than truthful or her

-18-

earlier practice was a ruse in anticipation of her testimony in this divorce case. [April] specifically stated that over $100,000 of payments for her mortgage and her property taxes was a loan. Later, [April] testified that it was in fact a gift. There can be no doubt that the size of this gift, as well as [April's] acknowledgement that she receives approximately $12,000 per month in financial assistance from her mother in addition to an annual salary and benefits of approximately $100,000, should alter the Court's calculations regarding maintenance.

The Court finds that [April's] financial circumstances have changed drastically from her initial testimony in this matter that led the Court to order [Clark] to pay [April] maintenance. Based on the increase in income of [April] and her access to gift income from her family, the Court finds that the prior maintenance award is unconscionable, as [April] can provide for her reasonable needs through her employment and other access to gift income. The Court terminates [Clark's] obligation to pay maintenance to [April] effective the date of the filing of the original motion on January 24, 2020. Any funds paid by [Clark] to [April] after the filing of said motion shall be refunded to [Clark]. [Clark] is directed to file an affidavit detailing any and all amounts paid as maintenance since January 24, 2020, within ten (10) days of the entrance of this order by the Madison Circuit Clerk. The Court will then enter a schedule by which [April] will repay [Clark].

Clark filed an affidavit on May 12, 2022, stating that, since January 24, 2020, he had paid $114,000.00 in maintenance to April.

April moved the court to alter, amend, or vacate its order pursuant to CR 59.05, regarding the retroactive date for the termination of maintenance. Clark had based his first motion upon her alleged cohabitation with Fuller, not any

-19-

additional financial resources April received. After the court ruled in June 2020 that Clark also needed to establish a change in her financial situation, Clark shifted his focus to her alleged financial support from Fuller. Clark did not file his second motion until July 2021, when he focused on her own financial circumstances. April contended that she should not have to reimburse Clark for the total amount he requested but only for those payments from the date he filed his second motion to terminate maintenance. She was entitled to notice of the allegations and the basis for Clark's request to terminate maintenance so that she could defend against his motion, which did not happen until July 2021. Clark objected to the motion.

The court entered its order ruling on the motion on June 24, 2022, after hearing argument from counsel. It agreed with April that the retroactive date should be changed, but it only moved it to June 10, 2020, the date on which it entered the order addressing the financial impact of her cohabitation.[3] "From that point forward [April] knew or should have known that her finances would be discussed." This appeal from the orders terminating maintenance now follows.

Before we address the merits of the appeal, we shall consider April's motion to strike Clark's appellee brief for his failure to comply with the Kentucky Rules of Appellate Procedure (RAP), which was passed to the merits panel. In her motion, April contends that Clark failed to adequately cite to the appellate record

---

[3] This order was entered on June 17, 2020.

(including to the video record), that he made statements of fact that were not in the record (such as claims regarding the sale of the residence and where she was living), that he failed to cite any law in support of his legal argument that the family court's decision was proper, and that the font and font size changed throughout the brief. In his response, Clark argues that he appropriately cited to the record where necessary, that the font size was appropriate, and that April could and should have raised his failure to cite to any legal authority in a reply brief as opposed to in a motion to strike. He concedes that he made statements of fact not in the record when he discussed the sale of April's residence but states that this was in response to the statement in April's brief that the residence had not yet been sold.

RAP 31 addresses the formatting and number of briefs required to be filed. It specifically requires in subsection (A)(1)(c) that the text be in "black type no smaller than 12 point set at standard width." Subsection (H) provides for penalties, including that "[a] brief may be stricken for failure to substantially comply with the requirements of these rules." RAP 31(H)(1). If an appellee fails to file a brief within the permitted time, "the court may: (a) accept the appellant's statement of the facts and issues as correct; (b) reverse the judgment if appellant's brief reasonably appears to sustain such action; or (c) regard the appellee's failure

as a confession of error and reverse the judgment without considering the merits of the case."  RAP 31(H)(3).

RAP 32, in turn, addresses the organization and contents of briefs and provides, in relevant part, as follows:

> (A) **Appellant's Opening Brief**.  An appellant's opening brief must contain the following sections, in the following order.
>
> . . . .
>
> > (3) A **statement of the case** consisting of a summary of the facts and procedural events relevant and necessary to an understanding of the issues presented by the appeal, with ample references to the specific location in the record supporting each of the statements contained in the summary.
> >
> > (4) An **argument** conforming to the statement of points and authorities, with ample references to the specific location in the record and citations of authority pertinent to each issue of law and which shall contain at the beginning of the argument a statement with reference to the record showing whether the issue was properly preserved for review and, if so, in what manner.
>
> . . . .
>
> (B) **Appellee's Response Brief**.  An appellee's response brief must contain the following sections:
>
> . . . .

(3) A counterstatement of the case stating whether the appellee accepts the appellant's statement of the case and, if not, setting forth the matters the appellee considers essential to a fair and adequate statement of the case in accordance with the requirements for appellant's statement of the case.

(4) An argument conforming to appellee's counterstatement of points and authorities and to the requirements for appellant's argument.

Here, we do not find any issue with the font size as that appears to be a printing issue, although counsel should review documents to ensure that they are printed properly. The remaining matters are problematic. We disagree with Clark that he "appropriately cited the record where necessary" as his brief contains at least 5 pages containing quotes and testimony from the August 10, 2021, and January 25, 2022, hearings that do not include any reference to the video record. However, because April also failed to include references to the video record in her brief, we decline to strike Clark's brief for this reason. In addition, we decline to strike his brief for failure to cite to any legal authority throughout his brief; rather, that shall go to the weight we afford his brief as we review April's legal arguments. Finally, we agree with April that Clark's references to the sale of the marital residence and her current living arrangements are not in the appellate record. Therefore, we shall not consider the passage on pages 11 and 12 of Clark's

brief referencing same. We shall enter a separate order this day ruling on the passed motion to strike as set forth above.

Turning to the merits of April's appeal, we must determine whether the family court properly terminated her maintenance award.

> We review the family court's determination regarding a motion to modify maintenance for an abuse of discretion. *See Bickel v. Bickel*, 95 S.W.3d 925, 927-28 (Ky. App. 2002). We cannot substitute our judgment for the family court's if there is substantial evidence supporting that court's decision. *Id*. at 928. Further, we may not set aside the family court's factual findings unless they are clearly erroneous. *See Wheeler v. Wheeler*, 154 S.W.3d 291, 296 & n.16 (Ky. App. 2004). However, we review questions of law *de novo*. *See Western Ky. Coca-Cola Bottling Co. v. Revenue Cabinet*, 80 S.W.3d 787, 790 (Ky. App. 2001).

*Block v. Block*, 252 S.W.3d 156, 159 (Ky. App. 2007). With this standard in mind, we shall consider April's arguments.

In Kentucky Revised Statutes (KRS) 403.200, the General Assembly set forth the considerations a court must make in determining whether an award of maintenance is appropriate. A court must first determine whether a spouse is entitled to maintenance by considering whether that spouse lacks sufficient property to provide for his or her reasonable needs and is unable to support himself or herself through appropriate employment. KRS 403.200(1). If a spouse is entitled to maintenance, the family court must then determine the appropriate

-24-

amount and duration to award, considering all relevant facts set out in KRS

403.200(2):

> The maintenance order shall be in such amounts and for such periods of time as the court deems just, and after considering all relevant factors including:
>
> > (a) The financial resources of the party seeking maintenance, including marital property apportioned to him, and his ability to meet his needs independently, including the extent to which a provision for support of a child living with the party includes a sum for that party as custodian;
> >
> > (b) The time necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment;
> >
> > (c) The standard of living established during the marriage;
> >
> > (d) The duration of the marriage;
> >
> > (e) The age, and the physical and emotional condition of the spouse seeking maintenance; and
> >
> > (f) The ability of the spouse from whom maintenance is sought to meet his needs while meeting those of the spouse seeking maintenance.

In *Mays v. Mays*, 541 S.W.3d 516 (Ky. App. 2018), this Court made it clear that

the purpose of maintenance is rehabilitation:

[T]he underlying purpose of maintenance [is] rehabilitation. Maintenance seeks to enable the unemployable spouse to acquire the skills necessary to support himself or herself in the current workforce so that he or she does not rely upon the maintenance of the working spouse indefinitely. *Gripshover v. Gripshover*, 246 S.W.3d 460, 469 (Ky. 2008). The goal of a maintenance award is to facilitate one's transition from dependence upon her former spouse to independence. This is consistent with another goal of the dissolution process which is to sever all ties as much as possible as soon as possible. *Light v. Light*, 599 S.W.2d 476, 479 (Ky. App. 1980) ("Since ongoing maintenance ties the parties together, it should be avoided except as circumstances of need and fairness demand.").

*Mays*, 541 S.W.3d at 527.

In the present case, the family court made detailed findings in its February 19, 2016, order about April's need for maintenance:

[April] testified that she had graduated from Eastern Kentucky University with a Public Relations degree and had been working for the Madison County Emergency Operations Center prior to marriage. After her marriage to [Clark] she became a housewife and remained a housewife throughout the parties' 19 year marriage. [April] owns a non-marital interest in two entities that own rental properties. She owns 99% of AKP and 50% of W&A. For the tax year 2014 [April] showed adjusted gross income of $31,801.00. [April] stated to the best of her knowledge in 2015 she received no paychecks or funds from either of these entities and if any personal expenses were paid they were in very small amounts.

Prior to [the January 19, 2016,] hearing the parties entered into a partial property settlement agreement providing [April] would receive the marital home which

-26-

she intends to sell. [Clark] received $100,000.00 cash to equalize the transaction. [April] also received all personal property located within the marital residence. [April] has since refinanced the home in her name only with the assistance of her father. She has a $3,400.00 per month mortgage payment until the home sells and she is receiving assistance in making this payment from her father. [Clark's] Exhibit #2 is a copy of the partial property settlement agreement.

[April] testified she has been helping out with her mother and father's family businesses and is not looking for other work. She also testified she may draw a check in the future but is not drawing a check currently.

Upon questioning by her own attorney [April] testified that the monthly spending in excess of $19,000.00 was common during the marriage and has continued since the marriage. [April] also testified under questioning from each attorney as to [Clark's] Exhibit #5, the mediated agreement as to temporary child support and maintenance. [April] testified that both mortgages, the property taxes and the homeowner's insurance that were [Clark's] responsibility under the mediated agreement are now [April's] responsibility as a result of the partial property settlement agreement. [April] further testified that the parties' son Ryder, ten years of age, attends the Lexington School. . . . Cost of the Lexington School is currently $2,864.00 per month.

[Clark] testified between 2012 and 2014 he had lost approximately $10.5 million in coal businesses due to the overall economic downturn within that industry. [Clark] stated that his 2014 tax return shows gross income of $335,000.00 and does not take into account his expenses. [Clark] refers the Court to page 1 of said return which shows his adjusted gross income of $42,397.00 for tax year 2014. [Clark] testified that he is refinancing personal businesses in [an] effort to maintain his lifestyle and has sold off various portions of his coal

business over the last few years. [Clark] testified he had put several hundred thousand dollars of his own money into various coal companies the past two years and that 25% of the money he received from the partial property settlement involving the marital residence went to business payroll. [Clark] further testified that he had not paid the parties' health insurance nor the $4,500.00 per month maintenance as agreed to by the [parties'] mediation agreement for the month of February. Upon questioning from opposing counsel [Clark] testified about Hunter's Trace, Arrowhead Holdings, Champ Properties and March Holdings, which appear to be entities that own real estate. Upon further questioning as to the 2014 tax return, while the coal companies showed individual losses they maintain over $50 million in assets.

Upon further questioning by both counsel, [April] acknowledged her family's real estate businesses own approximately 450 units with some additional units currently being built. She estimated the value of her work at $10 to $15 per hour. [April] further stated she did not see a problem working for no income.

After calculating and awarding child support, the family court concluded that April was entitled to maintenance. It found that April "lacks sufficient property, including marital property apportioned to her, to provide for her reasonable needs in accordance with the standard of living the parties have known throughout their 19 year marriage. The Court further states that [April] is unable to support herself through appropriate employment to the standard of living she has become accustomed." The court limited the award to 10 years and reduced the payment from $5,000.00 to $3,500.00 after five years. The court incorporated

-28-

the maintenance order in the October 11, 2016, decree. While Clark did appeal from the decree, he failed to file a brief, and his appeal was subsequently dismissed on April's motion. Therefore, Clark had the opportunity to raise such issues as to whether April was entitled to maintenance and whether the family court's factual findings in this regard were supported by substantial evidence, but he failed to do so. Instead, Clark has sought to terminate maintenance for a variety of reasons.

In KRS 403.250, the General Assembly provided for the modification or termination of a maintenance award:

> (1) Except as otherwise provided in subsection (6) of KRS 403.180, the provisions of any decree respecting maintenance may be modified only upon a showing of changed circumstances so substantial and continuing as to make the terms unconscionable. The provisions as to property disposition may not be revoked or modified, unless the court finds the existence of conditions that justify the reopening of a judgment under the laws of this state.

> (2) Unless otherwise agreed in writing or expressly provided in the decree, the obligation to pay future maintenance is terminated upon the death of either party or the remarriage of the party receiving maintenance.

"Maintenance becomes unconscionable if it is manifestly unfair or inequitable. To determine whether the circumstances have changed, we compare the parties' current circumstances to those at the time the court's separation decree was entered." *Tudor v. Tudor*, 399 S.W.3d 791, 793 (Ky. App. 2013) (internal quotation marks and citations omitted).

-29-

The family court found that April's financial circumstances had drastically changed from her original testimony that had led to an award of maintenance. The court noted that she was currently receiving income from the family businesses that she had once worked for without receiving a paycheck (stating that her earlier testimony was either "less than truthful or her earlier practice was a ruse in anticipation of her testimony in this divorce case"), and it noted the differing testimony about whether the money she received from her father was a gift or a loan. The court did not address April's alleged cohabitation with Fuller.

April spends a large portion of her brief addressing the cohabitation issue, but that question is not before this Court as the family court did not make any findings that she had been cohabitating with Fuller or that there was any financial impact due to cohabitation. Rather, the family court only addressed Clark's second motion to terminate maintenance, which was based solely on a change in April's financial circumstances, separate from anything to do with Fuller. Therefore, we shall not address anything related to cohabitation and whether maintenance could properly be terminated for that reason.

April's second argument addresses the merits of the family court's ruling, and we agree with her that the family court abused its discretion in terminating maintenance. The family court essentially based its ruling on its belief

-30-

that April's testimony in 2016 was less than truthful, discrepancies in testimony regarding funds April's father paid her or on her behalf, and Clark's assertion that her personal expenses were being paid through her and her family's businesses in addition to the salary she received. Clark contends that the amount of her monthly expenses was not reasonable or necessary. But as April points out, the court did not make any findings as to what her reasonable needs were or whether these needs could be met through employment. We note that April and Clark led a luxury lifestyle during their 19-year marriage. And the court was aware in 2016 that April's father had been making the mortgage payments for her until she could sell the marital residence. In addition, April testified in 2016 that she might begin receiving a paycheck rather than volunteering her services to the family businesses, meaning that it could not have been a surprise when she began receiving an income from Ramsey & Ramsey following the entry of the decree. In decreasing the amount of maintenance she would receive after five years and terminating it after 10 years, the family court surely contemplated that April would be increasing her income over that period of time.

We also recognize that the family court did not make any findings related to Clark's ability to pay. Throughout these proceedings, Clark has unsuccessfully tried to persuade the family court that even though his net worth is in the millions of dollars, he could not afford to pay maintenance to April. The

court properly rejected these attempts, most notably after he obtained a loan to purchase a $30,000.00 truck for his son's 16th birthday but at the same time signed his children up for Medicaid. His motion to terminate maintenance is merely another attempt to avoid paying maintenance to his former wife.

We cannot hold that Clark has made "a showing of changed circumstances so substantial and continuing as to make the terms unconscionable." KRS 403.250. We agree with April that the family court awarded her maintenance for 10 years, with a built-in reduction after five years, to provide her "with funds to assist with her living expenses for a period of time determined by the court necessary to become self reliant and to compensate April for the lack of assets awarded to her." Although April's monthly expenses are substantial, this is in keeping with the marital lifestyle. Finally, whether the funds April received from her father constituted a loan or a gift has yet to be determined, and April specifically testified that she planned to pay her father back once she sold the marital residence. At the time the family court entered its ruling, there was no evidence in the record that the residence had been sold.

Even if we were to hold that the family court did not abuse its discretion in terminating maintenance, we would hold that it abused its discretion in making the termination retroactive to June 2020 when it ordered that Clark would have to establish that April's alleged cohabitation with Fuller had a financial

impact on her to justify termination. The court reasoned that April would have been on notice at that time that her finances would be an issue. However, the family court's order terminating maintenance had nothing to do with cohabitation or the financial impact of cohabitation, but rather it was based upon April's own finances as raised in Clark's second motion to terminate maintenance filed on July 7, 2021. April could not have been on notice that solely her own finances were at issue until that time, and the court abused its discretion in setting the date more than a year prior.

For the foregoing reasons, the orders of the Madison Family Court terminating April's maintenance award are reversed.

ALL CONCUR.

| BRIEF FOR APPELLANT: | BRIEF FOR APPELLEE: |
|---|---|
| Martha A. Rosenberg<br>Lexington, Kentucky | Seth R. Thomas<br>Nicholasville, Kentucky |